# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

BAILEY HANKINS,                          )
                                         )
    Plaintiff,                       )    Case No. 3:13-0371
                                         )    Chief Judge Haynes
v.                                       )
                                         )
TRANSCANADA USA SERVICES,                )
INC.,                                    )
                                         )
    Defendant.                       )

## MEMORANDUM

Plaintiff, Bailey Hankins, filed this action[1] under the Older Workers Benefit Protection Act ("OWBPA") 29 U.S.C. § 626 and the Age Discrimination on Employment Act ("ADEA"), 29 U. S. C. §621 et seq. against the Defendant TransCanada USA Services, Inc., his former employer. Plaintiff alleges that Defendant terminated him with other older workers and required acceptance of a severance agreement that waived Plaintiff's and the other older workers' rights under the ADEA. Plaintiff's claim is that for such group terminations, OWBPA requires disclosures of the identity of other older workers who were terminated, but the Defendant failed to do so. Plaintiff alleges that Defendant's failure to make such a disclosure invalidates the waiver of his rights under the ADEA.

Before the Court is the Defendant's motion for summary judgment (Docket Entry No. 17) on Plaintiff's ADEA claim contending, in essence, that under his severance agreement, Plaintiff waived his ADEA rights and because Plaintiff was the only employee terminated, the OWBDA's

---

[1] There are two related action filed by Danny Carr and James Ethridge on the same factual allegations and claims. Danny Carr v. TransCanada USA Services, Inc., 3:13-0370 and James Ethridge v. TransCanada USA Services, Inc., 3:13cv-0372.

disclosures were not required. The Defendant contends that Plaintiff's termination was not part of an "Exit Incentive program" or "other involuntary termination program" under the OWBPA. Thus, the Defendant argues that Plaintiff voluntarily waived any claim under the ADEA. Plaintiff responds that he, Danny Carr and James Ethridge were effectively terminated at the same time with their compensation determined by the same method of calculation. Thus, Plaintiff contends that his termination, coupled with Carr's and Ethridge's terminations, qualify as a "involuntary termination program" requiring the Defendant to make OWBPA disclosures.

For the reasons set forth below, the Court concludes that Plaintiff has presented sufficient proof to support a judgment on his ADEA and OEPA claims, but material factual disputes exist about the waiver issue and whether the terminations were of a group of eligible employees. With these disputes, the Court cannot resolve this action on a motion for summary judgment.

## A. Review of the Record[2]

Plaintiff, Danny Carr and James Ethridge were onshore area operations managers for TransCanada's Mid America Region. (Docket Entry No. 17-1, Hankins Affidavit at ¶ 6, and Docket Entry No. 26-5, Ferguson Deposition at 137, 139). For their tenures at TransCanada, Plaintiff worked twenty-three (23) years, Carr worked thirty-six (36) years and Ethridge worked thirty-two (32) years. (Docket Entry No. 17-4, Carr Affidavit at ¶¶ 4, 5; Docket Entry No. 17-5, Ethridge

---

[2]Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986). As discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). The Court concludes that there are material factual disputes. Thus, this section does not constitute finding of facts under Fed.R.Civ.P. 56.

Affidavit at ¶¶ 4, 5; Docket Entry No. 17-1, Hankins Affidavit at ¶¶ 4, 5). Until July 2012, Plaintiff asserts that TransCanada's Mid America Region had offices in Celestine, Indiana that Carr managed; Sardis, Mississippi that Ethridge managed; West Monroe, Louisiana that Plaintiff managed; and Lafayette Louisiana that Ed Guillotte managed. Id.

In January 2012, Kyle Ferguson became the new Director of Operations for the Mid America Region and Plaintiff's immediate supervisor. (Docket Entry No. 17-1, Hankins Affidavit at ¶ 10). To increase productivity and profits, Ferguson considered restructuring the Mid America region to improve system its reliability and productivity. (Docket Entry No. 17-3, Ferguson Deposition at 55:6-56:8). Ferguson toured facilities and met with technicians and management. (Docket Entry No. 26-7, Ferguson Affidavit at ¶ 5). Ferguson decided that the Mid America Region should be divided into five areas and in June 2012, submitted a restructuring plan for five new areas in the Mid America Region with an additional operations manager. Id. On July 30, 2012, Ferguson emailed personnel about the restructuring of the Mid America Region, but operations manager positions were not eliminated. (Docket Entry No. 17-1, Hankins Affidavit, at ¶¶ 24, 29).

Citing performance problems, Ferguson believed that new leadership was necessary in three areas. (Docket Entry No. 17-3, Ferguson Deposition at 28, 29, 56, 57). According to Plaintiff, Ferguson met with Plaintiff and Ethridge in West Monroe, Louisiana on July 30, 2012, and was scheduled to meet Carr in Celestine, Indiana on August 2, 2012. (Docket Entry No. 26-5, Ferguson Deposition, Exhibit 2 at 28). Ferguson sent an email dated July 30, 2012 to the Mid America Region leadership team announcing that "[a]s a result of the restructuring," Hankins, Ethridge, and Carr would no longer hold their positions as Onshore Area Operations Managers. (Docket Entry No. 17-2,

Ferguson Affidavit, Exhibit A).[3] TransCanada advised Hankins, Carr, and Ethridge that their terminations were unrelated to their individual status, but rather were the results of the reorganization. (Docket Entry No. 17-4, Carr Affidavit ¶ 26; Docket Entry No. 17-5, Sept. Ethridge Affidavit ¶ 24; Docket Entry No. 17-1, Hankins Affidavit ¶ 22; Docket Entry No. 17-10, Holland Deposition at 180-181; Docket Entry No. 17-3, Ferguson Deposition at 137, Ex.2). TransCanada has a five (5) step progressive discipline policy that applies to supervisors requiring: (1) a verbal conversation regarding performance with the employee; (2) a documented verbal; (3) a written warning concerning poor performance; (4) suspension; and ultimately (5) termination. (Docket Entry No. 17-10, Holland Deposition at 31, 137-139). Ms. Holland did not know whether any conversation about the performance of Hankins, Carr, or Ethridge occurred. Id. at 171.

Ferguson determined that Plaintiff should be discharged for performance problems as an operations manager (Docket Entry No. 17-3, Ferguson Deposition at 57, 99, 104). On July 30, 2012, Ferguson told Plaintiff "there is no role to offer you in the new organization," and terminated him as an Onshore Area Operations Manager effective immediately as part of the reorganization. (Docket Entry No. 17-1, Hankins Affidavit ¶ 22; Docket Entry No. 17-3, Ferguson Deposition at 21-22, 137). Plaintiff asserts that Ferguson followed a script provided by Ms. Holland when he terminated Plaintiff. (Docket Entry No. 17-1, Ferguson Deposition at 22-23; Exhibit 2). The script did not mention Plaintiff's termination as based upon performance. Id. Holland was unaware of any document reflecting that Plaintiff's performance over his twenty-three (23) year career was less than satisfactory. (Docket Entry No. 17-10, Holland Deposition at 135).

---

[3] TransCanada replaced Mr. Carr (age 56), Mr. Ethridge (age 54), and Mr. Hankins (age 60) with younger workers: Keith Mossman (age 29), Brad Willoughby (age 45), Stewart Sportsman (age 48) and Raymond Harst (age 51). (Sept. Ethridge Affidavit ¶ 34).

On July 30, 2012, Holland provided Plaintiff a severance package based upon a standardized formula and benefits under TransCanada's severance program. (Docket Entry No. 26-1, Hankins Affidavit ¶ 22; Docket Entry No. 26-5, Ferguson Deposition at 21-22, 139; Docket Entry No. 17-10, Holland Deposition at 85). Plaintiff signed a severance agreement with approximately two (2) years worth of salary. (Docket Entry No. 26-1, Hankins Affidavit at ¶ 22). On August 1, 2012, Plaintiff received a lump severance payment of $254,808, two years' salary on top of his 2012 incentive compensation. Id. at Exhibit A. Plaintiff then executed an Agreement waiving all "claims directly or indirectly related to your employment or your separation," including for any "violation of any federal, state, or local laws of any jurisdiction" including, but not limited to, the Age Discrimination in Employment Act of 1967 ("ADEA") as amended by the Older Worker's Benefit Protection Act of 1990 ("OWBPA"). Id. Prior to signing the Agreement, Plaintiff had 45 days to consider the offer and to consult with an attorney of his choice. Id. The Agreement also contained a seven (7) day revocation period. Id. at ¶ 8. TransCanada routinely offers severance payments to separating managers in exchange for their agreement to sign a waiver. (Docket Entry No. 17-3, Ferguson Deposition at 148).

According to the Defendant, despite Plaintiff's termination on July 30, 2012, Carr and Ethridge remained employed and reported to Ferguson. (Docket Entry No. 26, Plaintiff's Response to Defendant's Statement of Undisputed Facts at ¶¶ 12, 13, 19). Yet, Carr asserts on five (5) occasions that he was terminated from his position as Onshore Area Operations Manager as a result of the reorganization of TransCanada's Mid America Region. (Docket Entry No. 17-4, Carr Affidavit ¶¶ 31, 36, 40, 44, 49). In his September 2013 affidavit, Ethridge asserts on three (3) occasions that he was terminated from his position as Onshore Area Operations Manager as a result

of the reorganization of TransCanada's Mid America Region. (Docket Entry No. 17-5, Ethridge Affidavit ¶¶ 31, 36, 41). Ferguson stated that Plaintiff, Carr, and Ethridge were all terminated from their responsibilities as the three (3) Onshore Area Operations Managers for TransCanada's Mid America Region on July 30, 2012 as part of the reorganization of the Region. (Docket Entry No. 17-3, Ferguson Deposition at 88, 137, Exhibit 3). According to Carr, on July 27, 2012, Ferguson called Carr to informed him of his termination as Onshore Area Operations Manager effective July 30, 2012 due to the reorganization. (Docket Entry No. 17-4, Carr Affidavit ¶ 26; Docket Entry No. 17-3, Ferguson Deposition at 39, 137).[4]

At some point, Ferguson offered Carr two options: (1) a demotion and pay cut with relocation as Engine Reliability Manager; or (2) a severance package of almost $300,000. (Docket Entry No. 17-4, Carr Affidavit at ¶ 26; and Docket Entry No. 17-3, Ferguson Deposition at 53). According to an August 8, 2012 email from Maureen Farrell, TransCanada's compensation specialist, "We just received this lateral move COS for Danny Carr. There is a reduction of pay, which is something TransCanada does not do – especially for a lateral move. Can you please provide a rationale, and indicate if the FMM role is the appropriate one? Based on the information in the COS, will reject the COS." (Docket Entry No. 26-8, Simpson Affidavit, Exhibit 2). Later, in response, Carr stated that the amount of severance "changes everything" (Docket Entry No. 17-4, Carr Affidavit at ¶ 28) and Ferguson contacted Holland to prepare a severance agreement for Carr. (Docket Entry No. 17-3, Ferguson Deposition at 134).

On August 2, 2012, Holland met with Carr in Celestine, Indiana, and presented him with a

---

[4]Ferguson did not state that Carr was being removed for performance related issues. (Docket Entry No. 17-4, Carr Affidavit at ¶¶ 22, 26).

severance agreement that was postdated August 13, 2012. (Docket Entry No. 17-4, Carr Affidavit ¶ 32, Exhibit A; Docket Entry No. 17-3, Ferguson Deposition at 44-45, 136-37, 139).[5] Holland reiterated Ferguson's statement on July 27, 2012 that Carr would be terminated as Onshore Area Operations Manager due to the reorganization. (Docket Entry No. 17-4, Carr Affidavit ¶ 32). On August 9, 2013, Carr informed Ferguson that he accepted the severance package, citing the large amount of severance pay. Id. ¶ 38. Carr signed an updated severance agreement dated August 31, 2012, with two years' salary and a waiver of his rights and claims under the ADEA. Id. ¶ 40, Exhibit D.[6] According to the Defendant, Ferguson offered Carr a Engine Reliability Project Manager position created on July 27, 2012, (Docket Entry No. 17-3, Ferguson Deposition at 39; and Docket Entry No. 17-4, Carr Affidavit at ¶¶ 26-28), with TransCanada at a six figure salary (Docket Entry No. 17-2, Ferguson Affidavit at ¶¶ 13-15) that was about 12 percent less that Carr's area operations manager salary. Id. Ferguson then offered a nine-month salary regression schedule to minimize the change in salary, ( Docket Entry No. 17-2, Ferguson Affidavit at ¶ 15), but Carr resigned. (Docket Entry No. 17-4, Carr Affidavit at ¶ 38, Exhibit B). For tax reasons, Carr remained on TransCanada's

---

[5] TransCanada did not produce Exhibit A to the Affidavit of Danny Carr in discovery, and although Ms. Holland admits she prepared a draft severance agreement for Mr. Carr and that it would be on file at TransCanada's offices in Calgary, she did not know why Plaintiff was not provided the document during discovery. (Docket Entry No. 17-10 Holland Deposition at 62, 64).

[6] Ethridge and Carr did not voluntarily resign from their employment or positions as Onshore Area Operations Manager, but rather they were terminated from their positions effective July 30, 2012 and offered the same severance packages reflecting a standardized formula and package of benefits. (Docket Entry No. 17-5, Ethridge Affidavit ¶ 31; Docket Entry No. 17-4, Carr Affidavit ¶ 41; Docket Entry No. 17-10, Holland Deposition at 85). Ethridge and Carr accepted the severance that was offered at the time they were informed of their terminations. (Docket Entry No. 17-4, Carr Affidavit ¶ 40; Docket Entry No. 17-5, Sept. Ethridge Affidavit ¶ 32).

payroll until October 15, 2012. (Docket Entry No. 17-4, Carr Affidavit at ¶ 36; Docket Entry No. 17-2, Ferguson Affidavit at ¶ 18). On August 23, 2012, Carr proposed a departure date of August 31, 2012 that Ferguson accepted. (Docket Entry No. 17-2, Ferguson Affidavit at ¶ 19, Exhibit C). At Carr's request, Ferguson increased the salary offer, but Carr declined. Id. at ¶¶ 15,17. Carr described his decision as "the hardest decision of his career" and stated that he felt "bad that [he] had everyone thinking he would take the [ERP] job." (Docket Entry No. 17-4, Carr Affidavit, Exhibit A).

On July 30, 2012, Ethridge asserts that Ferguson informed him "there is no role to offer you in the new organization," as Onshore Area Operations Manager, but gave Ethridge one (1) month to find a new job or accept a severance package. (Docket Entry No. 17-5, Ethridge Affidavit ¶ 24). Ferguson considered Ethridge as failing to meet TransCanada's objectives for an Area Operations Manager. (Docket Entry No. 17-3, Ferguson Deposition at 97). According to Ferguson, Ethridge would be considered for jobs in TransCanada's U.S. Project Management/Construction Management division. Id. at 130, 131. Ferguson talked to Jon Draeger, the division's director and John Lattin, Manager of Pipeline & Capacity Projects whom Ferguson asked to consider Ethridge for a position in their division. Id. Ferguson asked managers in that division to consider Ethridge for a position. (Docket Entry No. 17-2, Ferguson Affidavit at ¶¶ 8, 9). Ethridge and these managers talked about potential job opportunities, but Ethridge did not apply for a new position, (Docket Entry No. 17-5, Ethridge Affidavit, ¶¶ 26, 30), nor does the record reflect a job offer from the Defendant's managers.

Two managers in Draeger's division contacted Ethridge about job opportunities, but on August 28, 2013 Ehtridge notified TransCanada of his resignation. (Docket Entry No. 17-5. Ethridge Affidavit, at ¶¶ 32). Ethridge contacted Heather Holland, TransCanada's Human Resources Manager

about a severance package. (Docket Entry No. 17-6, Holland October 17, 2013 Affidavit at ¶ 3, Exhibit A). Ferguson offered to extend the time for Ethridge to apply, but Ethridge declined. (Docket Entry No. 17-2, Ferguson Affidavit at ¶ 9). Holland reviewed the benefits Ethridge would receive, if he remained with TransCanada until the retirement-eligible age at 55 in October 2012. (Docket Entry No. 17-6, Holland Affidavit at ¶ 3, Exhibit A). Holland also advised Ethridge about how to approach Ferguson as Holland understood Ethridge was being considered for Project Manager and Construction Services Manager positions. Id.

Ferguson then provided Ethridge with a postdated severance agreement dated August 31, 2012 as part of the reorganization that utilized a standardized formula and package of benefits under TransCanada's severance program. (Docket Entry No. 17-5, Ethridge Affidavit at ¶ 24, Exhibit A; Docket Entry No. 17-3, Ferguson Deposition at 78, 127, 139). According to Ethridge, Ferguson tendered the severance package to Ethridge on July 30, 2012 and urged him to accept. (Docket Entry No. 17-5, Ethridge Affidavit at ¶ 24). According to Ethridge, Ferguson failed to secure a single job interview for him during August 2012, and on August 28, 2012, Ethridge accepted the severance offer. (Docket Entry No. 17-5, Ethridge Affidavit at ¶¶ 30, 32). Ethridge signed the severance agreement with two (2) years salary and a waiver of his rights and claims under the ADEA. Id. at ¶ 32, Exhibit B.

Plaintiff's severance agreement was identical to Carr's and Ethridge's agreements with the same formula utilized to calculate their severance benefits. (Docket Entry No. 17-10, Holland Deposition at 187:22-188:10; Docket Entry No. 17-6, Holland Oct. 17, 2013 Affidavit at ¶ 7). Ferguson testified in his deposition, "In my experience working for the company for the last 24 years every single time I've been involved in any type of involuntary or voluntary dismissal or termination

a severance package was given." (Docket Entry No. 17-3, Ferguson Deposition at 148:14-20).

The context for these events, Plaintiff cites, is Ferguson's March 2012 announcement to Onshore Area Operations Managers that "changes are coming," and urged them to search for other job postings. Ferguson asked the Onshore Area Operations Managers questions such as: (1) "Why are you here? No one in Canada works past the age of 55. There are going to be changes around here." (2) "What is that old guy still doing working here?" (3) "Why are those old guys still working?" (4) "You are 54 years old, and ten years is a long time to just be hanging around." (5) "When are you going to retire?" (6) "You are 60, you can afford to retire. Look at all those toys you have." (7) "I am here to make changes. I am going to get rid of the dead weight." (8) "What is that old guy doing hanging around here anyway?" (Docket Entry No. 17-1, Hankins Affidavit at ¶ 11).

At an April 19, 2012 Mid America Region managers' meeting, Ferguson stated that he was going to "bust people back" and "lower their pay." Id. ¶ 15. Plaintiff, Carr, and Ethridge told Ferguson this plan was age discrimination because the persons to be "bust back and lower their pay" were over the age of forty (40) with twenty-five (25) to thirty (30) years of employment. Id. ¶¶ 15-16. Ferguson responded that he had "done it in Canada and [he could] do it here." (Id. ¶ 18). On July 27, 2012, Ferguson initiated a conference call with the Onshore Area Operations Managers announcing the restructuring and that he would inform them of their new roles and responsibilities the following Monday, July 30, 2012. Id. ¶ 21.

## B. Conclusions of Law

"The very reason of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Advisory Committee Notes on Rule 56, Federal Civil Judicial Procedure and Rules (West Ed. 1989). Moreover, "district courts are

widely acknowledged to possess the power to enter summary judgment <u>sua</u> <u>sponte</u>, so long as the opposing party was on notice that she had to come forward with all of her evidence." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 326 (1986). <u>Accord</u>, <u>Routman v. Automatic Data Processing, Inc.</u>, 873 F.2d 970, 971 (6th Cir. 1989).

In <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment 'shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' By its very terms, this standard provides that the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact.

> <u>As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.</u> Factual disputes that are irrelevant or unnecessary will not be counted.

477 U.S. at 247-48 (emphasis in the original and added in part). Earlier the Supreme Court defined a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" <u>Matsushita Electrical Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 326 (1986). Where there has been a reasonable opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment. <u>Emmons v. McLaughlin</u>, 874 F.2d 351, 355-57 (6th Cir. 1989). <u>But see Routman v. Automatic Data Processing, Inc.</u>, 873

F.2d 970, 971 (6th Cir. 1989).

There is a certain framework in considering a summary judgment motion as to the required showing of the respective parties as described by the Court in Celotex

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.

Celotex, 477 U.S. at 323 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying Rule 56(c) standards." Martin v. Kelley, 803 F.2d 236, 239, n. 4 (6th Cir. 1986). The moving party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. Sims v. Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991)(quoting Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its initial burden of 'demonstrating the absence of a genuine issue of material fact,' the nonmoving party then 'must set forth specific facts showing that there is a genuine issue for trial.'" Emmons v. McLaughlin, 874 F.2d 351, 353 (6th Cir. 1989) (quoting Celotex and Rule 56(e)).

Once the moving party meets its initial burden, the Court of Appeals warned that "[t]he respondent must adduce more than a scintilla of evidence to overcome the motion [and]. . . must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989)(quoting Liberty Lobby). Moreover, the Court of Appeals explained that

The respondent must 'do more than simply show that there is some metaphysical

doubt as to the material facts.' Further, `[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is `implausible.'

Street, 886 F.2d at 1480 (cites omitted). See also Hutt v. Gibson Fiber Glass Products, No. 89-5731 (6th Cir. filed September 19, 1990) ("A court deciding a motion for summary judgment must determine `whether the evidence presents a sufficient disagreement to require a submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." quoting Liberty Lobby)).

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

> More important for present purposes, summary judgment will not lie if the dispute about a material fact is `genuine' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.
>
> * * *
>
> Progressing to the specific issue in this case, we are convinced that the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict -- `whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'

Liberty Lobby, 477 U.S. at 248, 252 (citation omitted and emphasis added).

It is likewise true that

> [I]n ruling on a motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. It has been stated that: `The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute. . . .'

Bohn Aluminum & Brass Corp. v. Storm King Corp., 303 F.2d 425, 427 (6th Cir. 1962) (citation omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must be read in a light most favorable to the party opposing the motion." Duchon v. Cajon Company, 791 F.2d 43, 46 (6th Cir. 1986) app. 840 F.2d 16 (6th Cir. 1988) (unpublished opinion) (citation omitted).

The Court of Appeals further explained the District Court's role in evaluating the proof on a summary judgment motion

> A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshalling of evidence by the nonmoving party sufficient to establishing a genuine issue of material fact for trial. This marshalling of evidence, however, does not require the nonmoving party to "designate" facts by citing specific page numbers. Designate means simply "to point out the location of." Webster's Third New InterNational Dictionary (1986).

> Of course, the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989) cert. denied 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990). In this district, the parties must provide specific references to the proof upon which they rely. See Local Rule 56.01(c) requiring each party to provide a statement of undisputed

facts to which the opposing party must respond.

In Street, the Court of Appeals discussed the trilogy of leading Supreme Court decisions, and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions

1.     Complex cases are not necessarily inappropriate for summary judgment.

2.     Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3.     The movant must meet the initial burden of showing 'the absence of a genuine issue of material fact' as to an essential element of the non-movant's case.

4.     This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5.     A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the party must prevail as a matter of law.'

6.     As on federal directed verdict motions, the 'scintilla rule' applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7.     The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8.     The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'

9.     The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10.     The trial court has more discretion than in the 'old era' in evaluating the respondent's evidence. The respondent must 'do more than simply show that there

is some metaphysical doubt as to the material facts.' Further, `[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is `implausible.

Street, 886 F.2d at 1479-80.

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment: (1) has the moving party "clearly and convincingly" established the absence of material facts?; (2) if so, does the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense?; (3) if factual support is presented by the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under the applicable law?; and (4) are there any genuine factual issues with respect to those material facts under the governing law?

An employee can waive an ADEA claim if the employee's waiver is "knowing and voluntary." 29 U.S.C. § 626(f)(1). Yet, for older workers, where the waiver is "requested in connection with an exit incentive or other employment termination program offered to a group or class of employees," OWBPA requires additional notice about terms of such programs. 29 U.S.C. § 626(f)(1)(H). For qualifying programs, the employer must afford the employee a 45-day period to consider the waiver and the employer must "inform the individual in writing in a manner calculated to be understood by the average individual eligible to participate, as to

(I) any class, unit, or group of individuals covered by such program, any eligibility factors for such program, and any time limits applicable to such program; and

(ii) the job titles and ages of all individuals eligible or selected for the program, and the ages of all individuals in the same job classification or organizational unit who are not eligible or selected for the program.

29 U.S.C. § 626(f)(1)(F)(ii); 29 U.S.C. § 626(f)(1)(H)(i)-(ii).

16

The OWBPA does not define an "exit incentive program" or "other termination program." Barnes v. The Hershey Co., 2012 U.S. Dist. LEXIS 159339 (N.D. Cal. Nov. 6, 2012 ) ("There is no clear definition of what constitutes 'an exit incentive or other termination program' under 29 U.S.C.§ 626(f)(1)(H)"); Thiessen v. GE Capital Corp., 232 F. Supp. 2d 1230, 1240 (D. Kan. 2002) ("The statute itself does not define 'exit incentive' or 'employment termination program,' and very few cases have analyzed the meaning of the phrases."). The legislative history of OWBPA distinguishes between "individual separation agreements" and "programs" as follows:

> Individual separation agreements are the result of actual or expected adverse action against an individual employee. The employee understands that action is being taken against him, and he may engage in arms-length negotiation to resolve any differences with the employer.

> Group termination and reduction programs stand in stark contrast to the individual separation . . . **[E]mployers faced with the need to reduce workforce size have resorted to standardized programs designed to effectuate quick and wholesale reductions.** The trademark of involuntary termination programs is a standardized formula or package of employee benefits that is **available to more than one employee.**

Sen. Rep. No. 101-263 at 32 (1990), 1990 USCCAN 1509, 1537-38 (emphasis added).

The Senate Committee believed that these information requirements in 29 U.S.C. § 626(f)(1)(i)-(ii) were necessary to "permit older workers to make more informed decisions [regarding waiver of their ADEA rights and claims] in group termination and exit incentive programs." Id. The Senate Report also provides a mechanism to identify employment termination programs requiring the additional notification under 29 U.S.C. § 626(f)(1)(i)-(ii):

> **The trademark of involuntary termination programs is a standardized formula or package of employee benefits that is available to more than one employee. The trademark of voluntary reduction programs is a standardized formula or package of benefits designed to induce employees voluntarily to sever their employment.** In both cases, the terms of the programs generally are not subject to

17

negotiation between the parties. In addition, employees affected by these programs have little or no basis to suspect that action is being taken based on their individual characteristics. Indeed, the employer generally advises them that the termination is not a function of their individual status. Under these circumstances, the need for adequate information and access to advice before waivers are signed is especially acute.

101 S. Rpt. 263 at 32 (emphasis supplied); see also 101 H. Rpt. 664 at 54. Under these circumstances, "[T]he need for adequate information and access to advice before waivers are signed is especially acute." 101 S. Rpt. 263 at 32.

OWBPA regulations require that at a minimum, such termination programs must impact more than one employee.

The existence of a 'program' will be decided upon the facts and circumstances in each case. A 'program' exists when an employer offers additional consideration for the signing of a waiver pursuant to an exit incentive or other employment termination (e.g., a reduction in force) to two or more employees. **Typically, an involuntary termination program is a standardized formula or package of benefits that is available to two or more employees, while an exit incentive program typically is a standardized formula or package of benefits designed to induce employees to sever their employment voluntarily. In both cases, the terms of the programs generally are not subject to negotiation between the parties.**

29 CFR 1625.22(f)(iii)(B)(emphasis added).

OWBPA requires that "the party asserting the validity . . . shall have the burden of proving . . . that a waiver was knowing and voluntary." 29 U.S.C. § 626(f)(3). To be knowing and voluntary, a waiver must conform to the OWBPA's stringent notice requirements. Oubre v. Entergy Operations, Inc., 522 U.S. 422, 426-27 (1998). To challenge the waiver of ADE, the employee need not tender the severance payment in connection with the waiver. Oubre, 522 U.S. at 426-27. The OWBPA defines a waiver as "knowing and voluntary" waiver:

(A) the waiver is part of an agreement between the individual and the employer that is written in a manner calculated to be understood by such individual, or by the

18

average individual eligible to participate;

(B) the waiver specifically refers to rights or claims arising under this Act;

(C) the individual does not waive rights or claims that may arise after the date the waiver is executed;

(D) the individual waives rights or claims only in exchange for consideration in addition to anything of value to which the individual already is entitled;

(E) the individual is advised in writing to consult with an attorney prior to executing the agreement;

(F)(i) the individual is given a period of at least 21 days within which to consider the agreement; or

> (ii) if a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, the individual is given a period of at least 45 days within which to consider the agreement; and

(G) the agreement provides that for a period of at least 7 days following the execution of such agreement, the individual may revoke the agreement, and the agreement shall not become effective or enforceable until the revocation period has expired.

29 U.S.C. § 626(f)(1).

Here, when considering the evidence in a light most favorable to Plaintiff, as required on this type of motion, Plaintiff has presented proof that prior to July 30, 2012 Ferguson announced his true intentions for a group termination of area operations managers. At an April 19, 2012, Mid America Region managers' meeting, Ferguson stated that he was going to "bust people back" and "lower their pay." (Docket Entry No. 17-1, Hankins Affidavit at ¶ 15). Plaintiff, Carr, and Ethridge told Ferguson that his plan constituted age discrimination if the persons to be "bust back and lower their pay" were over the age of forty (40) with twenty-five (25) to thirty (30) years of employment. <u>Id.</u> ¶¶ 15-16. Ferguson responded that he had "done it in Canada and [he could] do it here." (Id. ¶ 18).

On July 27, 2012, Ferguson initiated a conference call with the Onshore Area Operations Managers announcing the restructuring and that he would inform them of their new roles and responsibilities the following Monday, July 30, 2012. Id. ¶ 21. TransCanada advised Plaintiff, Carr, and Ethridge that their terminations were unrelated to their individual status, but were the results of the reorganization. (Docket Entry No. 17-4, Carr Affidavit ¶ 26; Docket Entry No. 17-5, Sept. Ethridge Affidavit ¶ 24; Docket Entry No. 17-1, Hankins Affidavit ¶ 22; Docket Entry No. 17-10, Holland Deposition, pp. 180-18). Plaintiff's proof includes assertions that Carr's and Ethridge's severance agreements were post dated. Ferguson then provided Ethridge with a postdated severance agreement dated August 31, 2012 as part of the reorganization that utilized a standardized formula and package of benefits under TransCanada's severance program. (Docket Entry No. 17-2, Ferguson Affidavit at ¶ 24, Exhibit A; Docket Entry No. 17-3, Ferguson Deposition at 78, 127, 139). Plaintiff's severance package contained identical terms to the severance agreements of Carr and Ethridge.

To be sure in <u>Wells v. Xpedx</u>, 319 Fed. Appx. 798, 799 (11th Cir. 2009), an employer's generous severance package in exchange for the employer's release of claims was enforced because the Plaintiff was the only employee terminated. <u>Id.</u> <u>See also</u> <u>Grizzaffi v. DSC Logistics</u>, 2001 U.S. Dist. Lexis 12494 *11 (N.D. Ill. 2001). ("Individuals terminated at different times for different reasons can hardly be considered part of a group."). Although there is proof of Carr's and Ethridge's leaving employment at TransCanada prior to Plaintiff, the Court considers other proof about Ferguson's April 12th announcement and purpose of the restructuring of the Mid-Region to create factual disputes. After Ferguson made those remarks, Ferguson cited his prior experience in Canada, to which Plaintiff raised the specter of an ADEA violation. The proof reflects that thereafter different approaches were taken with these former managers. In a word, the Court concludes that the latter

measures create a factual issue of whether the Defendant's measures were a pretext for a restructuring that would result in Plaintiff's, Carr's, and Ethridge's termination on identical terms covered by the OWBPA.

Thus, the Court concludes that material factual disputes exist and the Defendant's motion for summary judgment should be denied.

An appropriate order is filed herewith.

**ENTERED** this the ___ 22nd ___ day of May, 2014.

WILLIAM J. HAYNES, JR.
Chief Judge
United States District Court